Westbrook, J.
By separate writs of certiorari prosecuted under chapter 269 of the Laws of 1880 the relator seeks to review its assessments*in the town of Marbletown, Ulster county, in the years 1882 and 1883. A referee was appointed to take the evidence and the proceedings are now submitted, after argument, upon the report of the referee.
The relator owns a canal extending from Eddyville, .the head of navigation upon the Rondout creek, in the county of Ulster and state of Hew York, to Honesdale in the state of Pennsylvania.
The total length of the canal is 108 milesj four miles of which are within the town of Marbletown. The total assessment of the relator in such town is $180,000, all of which is for the canal, except about $10,000 which is for other property. The valuation of the canal in the town is about $42,500 per mile.
The total assessed value of personal property in the town is $10,450 for the year 1882 and $12,025 for the year 1883. *455 JSTo evidence was given in regard to these valuations, and their correctness will, for the purposes of the present proceeding, be assumed, though it seems incredible that in an entire town of the wealth and size of Marbletown the amount of personal property liable to taxation is so inconsiderable.
It is conceded that all the real estate in the town with the 'exception of that of the relator is valued upon the rolls for the years 1882 and 1883 at forty-four and seven-tenths per cent of its actual value. This admission renders unnecessary any discussion as to the valuation of such other property and narrows it to one single point, the value of the canal per mile.
In view of the fact that the assessors of the town concede they have valued all the real estate of the town, with the exception of that owned by the relator, at, less than half its actual value, it is not improper to say that they admit a clear violation of the statute, which declares: “All real and personal estate liable to taxation shall be estimated and assessed by the assessors at its full and true value as they would appraise the same in payment of a just debt due from a solvent debtor ” (2 R. S. [7th ed.], 992, sec. 17). In view of the same concession it is difficult to conceive how the respondents could swear, as they did swear for two years, and as the statute required them to do (2 R. S. [7th ed.], 994, sec. 8), that in the valuation of the real estate in the town they had complied with this enactment. It is perhaps, however, due to the respondents to say that, doubtless, long practice in their town, which, believing to be right, they adopted, somewhat softens the moral view to be taken of their conduct, but the bald fact still remains that there has been a gross and clear departure from a very plain statute.
In ascertaining the value of property, similar to that owned by the relator, this court held in the The People ex rel. The Wallkill Valley Railroad Company agt. Keator and others (67 How., 277), recently affirmed at general term, but as yet unreported, and in The People ex rel. The Albany and Greenbush Bridge Company agt. Weaver and others (67 How., 477), *456 also affirmed at general term (34 Hun, 327), and likewise in the court of appeals, that its earning capacity was largely the test.
The canal of the relator, as shown by its acts of incorporation, and as is well known in fact, was built to supply an avenue to bring its own anthracite coal from its mines in Pennsylvania to the Hudson river. The transportation of suph coal to market is the principal use of the canal. The total amount of tolls received by the relator, for the use of its canal by other parties, was $60,007.52 in the year 1882, and $52,403.39 in the year 1883. The cost of operating and maintaining the canal was $175,617.42 in 1882, and $183,525.58 in 1883. As the results for the two years referred to are not phenomenal, but are a fair average of a number of years, it is safe to say that the cost year by year of maintaining and operating the canal is three times as great as its receipts. It is true that in making this statement no allowance is made for the coal belonging to the relator which passes over the canal, for that pays no toll, and therefore furnishes no revenue, though it must be more or less of a benefit to the relator. The total amount of the revenues of the canal is, however, an important factor to ascertain its value for the purposes of taxation; and in this connection the further fact must be considered that wdiile the canal originally was the sole outlet for the relator’s coal, the cost of transportation thereover, as compared with that by rail, has diverted more than two-thirds of the production of its mines from that avenue to others created by railroad.
The assessors are not, however, to value the property according to its needs to the relator, but “ at its full and true value as they would appraise the same in payment of a just debt from a solvent debtor.” Applying this test, at what sum should the canal be valued ? The buyer would be informed that the receipts of the canal were far less than its maintaining and operating expenses to be paid out. If he had no coal to transport to market he would probably conclude that it was not *457 worth the taking if it was to be maintained and operated, and if he had the coal for the carrying of which he could utilize the property he would naturally insist that if he took such an old and obsolete way as a canal, it should be put to him at a price so cheap that it would better pay him to put his capital in it than in a railroad.
Under circumstances such as have been described it is difficult to value the property. The day of canals has clearly gone by. Hot only is this shown by the evidence of the relator, but the history of those owned by the state demonstrates that they can no longer be a source of revenue to their owners. Feeling the force of this fact the witnesses called by the relator (principally its officers, with the exception of Hr. Slevens an eminent canal and railroad engineer from Hew Jersey), value the canal at a sum not exceeding $8,000 per mile, while some of them regard it as of no value except for the bed of a railroad to be constructed. Hor is this evidence substantially controverted by the respondents. One of their two witnesses on valuation, Hr. Sweet, makes its value computed upon its cost $50,000 per mile, but he declines to give an estimate of its value based upon its capacity to earn money. It is difficult, as has been before stated, to say what valuation should be put upon the property. If its value is estimated by its earning capacity, solely, to a buyer other than the present owner (to whom it is of some value to transport its own property), as the statute contemplates, it would be worth nothing.
Ho person not the owner of coal lands in Pennsylvania would take it as a gift if the gift was coupled with a covenant by him to maintain and operate it as a canal; and the owner of coal lands, who had to find an outlet for the production would only pay a price, which by its cheapness would make it an object for him to invest his money therein rather than in a railroad. The relator, however, owns this property, and has coal in Pennsylvania to be mined and to be transported. It must, for that purpose, have some value or it would be abandoned. It forms a part of the property of the town, and *458 should bear a part of its burdens. Mathematical accuracy is impossible, but if it is valued at a sum twice as great as the highest value placed upon it by the relator’s witnesses, the respondent will have no cause of complaint. It is clearly overvalued upon the tax rolls. Taking into account the earning capacity of the canal it is plain that it should not be valued beyond $16,000 per mile. It is a sum believed to be greater than any creditor of the relator would receive it for in extinguishment of its debts; and the taxable valuation is fixed „ at that sum as being the very highest which the testimony will warrant. As the relator’s property should be taxed at the same rate with that of all other property in the town, the conclusion is that duringhhe years 1882 and 1883 the valuation of the canal should have been at a sum which forty-four and seven-tenths per cent of $16,000 per mile would produce, and at the same per cent upon $10,000 of property other than the canal.
The remaining question is one of costs. The highest val nation placed upon the canal of the relator, and that was an estimate based upon cost, and not its earning capacity, was $50,000 per mile. With- what justice did the respondents estimate its value at $42,500 or thereabouts per mile,’ when they knew they had estimated their own property and that of their neighbors by a different rule ? Will they pretend that they valued the property of the relator, as they did that of others, at only forty-four and seven-tenths per cent of its actual value ; or must they admit that while swearing to act impartially they have done the reverse ? If the property of the relator was valued at the same rate as that of others, they must have deliberately determined that its actual value per mile was about $95,000, a sum so much in excess of their own evidence that it is difficult to predicate good faith in their action. Perhaps, however, charity require^ the conclusion that the errors are mistakes rather than crimes, and acting upon that assumption no costs will be imposed.